UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| SAMANTHA GARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  1:11CV228 TIA |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial

review of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of

the Social Security Act and for Supplemental Security Income benefits under Title XVI of the

Act.  The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

**I.  Procedural History**

On May 14, 2009, Plaintiff filed applications for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").  (Tr. 13, 65-67)  Plaintiff alleged disability beginning

October 16, 2008 due to bi-polar disorder, migraines, and depression.[2]  (Tr. 13, 91)   Plaintiff's

applications were denied on July 27, 2009, after which Plaintiff requested a hearing before an

Administrative Law Judge (ALJ).  (Tr. 65-67, 91-100)  On May 16, 2011, Plaintiff appeared and

---

[1]  Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this action.

[2]  Plaintiff filed prior applications for disability benefits and had two prior unfavorable disability hearing decisions.  The last unfavorable decision was issued on October 15, 2008.  (Tr. 13)

testified at a hearing before an ALJ.[3]  (Tr. 33-64)  In a decision dated June 24, 2011, the ALJ

determined that Plaintiff was not under a disability from October 16, 2008 through the date of the

decision.  (Tr. 13-21)  On October 31, 2011, the Appeals Council denied Plaintiff's Request for

Review.  (Tr. 1-3)  Thus, the decision of the ALJ stands as the final decision of the

Commissioner.

## II.  Evidence Before the ALJ

On May 16, 2011, Plaintiff appeared at a hearing before an ALJ and was represented by

counsel.  Upon questioning by the ALJ, Plaintiff testified that she was 40  years old and lived with

her daughter and five-year-old granddaughter.  She dropped out of school in the tenth grade.  She

then enrolled in vocational training for welding and unsuccessfully attempted to obtain her GED.

She had a certificate for 500 hours of welding training but was not a certified welder.  Plaintiff

had on-the-job experience performing framing, roofing, air conditioning duct work, and plumbing.

She testified that she last worked as a welder at Consolidated Personnel Services (CCC) for about

a month and a half in 2006.  Plaintiff also previously worked as a cook and part-time waitress at a

restaurant called Al's Place.  Additionally, Plaintiff worked for OFI in 2004 and 2005 installing air

conditioners, as well as assembling and installing the duct work.  She also worked at Pizza Hut on

two occasions and for McBride Metals, cleaning large metal totes.  (Tr. 37-43)

Plaintiff further testified that she was unable to work because the jobs she was skilled for

did not provide insurance for her medication, and she could not hold a job without medication.

---

[3]  Plaintiff previously appeared at a December 8, 2010 hearing, during which the ALJ
recommended that Plaintiff find an attorney to represent her in the Social Security proceedings.
(Tr. 26-32)

She stated that she had been in and out of psychiatric hospitals from ages 24 through 36.  Plaintiff took Prozac and Clonazepam for bipolar disorder; and Amitriptyline, Inderal, and Sumatriptan for migraines.  Dr. Nawas, Plaintiff's psychiatrist, prescribed the medication.  Plaintiff also saw a new neurologist, Dr. Alonzo, because her previous neurologist, Dr. Brenner, could no longer fit her in.  She testified that Dr. Brenner found a lesion at the base of her brain that could be the cause of the migraines.  Plaintiff stated that her medications for depression and bipolar disorder were helpful.  However, her medications made her drowsy.  She experienced headaches daily, but she did not like taking pills.  In addition to her migraine medications, Plaintiff took Naproxen as needed to help with the more severe headaches.  Her headaches did not follow any sort of pattern but just hit her "whenever."  Plaintiff stated that at least once a month she experienced a three to four-day spell where she was unable to tolerate anything.  During these occasions, she would go to the doctor's office and get a shot.  Every week, she had a headache that was severe enough to require taking a pill.  Her headaches were worse if she stopped drinking caffeine or quit smoking.  Chiropractic care had been recommended, but Plaintiff was unable to find a chiropractor that would take Medicaid.  (Tr. 43-51)

On days when her headaches were not severe, Plaintiff would watch TV or play with her granddaughter.  Plaintiff did not have a car but had friends that drove her to the grocery store.  Plaintiff did not go to the movie theater because it hurt her head, and she did not like being around crowds.  Despite medication, she still experienced anxiety attacks.  She did not attend any support group therapy sessions, although she previously went to AA and ALANON meetings, as well as a Bible Study.  Plaintiff did not drink alcohol, but her family on both sides were alcoholics.  When Plaintiff was headache-free, she had no problems taking care of herself.  However, with the

3

headaches, Plaintiff stayed in bed for three or four days.  Plaintiff enjoyed listening to music, but using the computer caused her eyes and head to hurt.  (Tr. 51-53)

Plaintiff also testified that she had no limitations to her ability to stand, walk, or sit on regular headache days.  Plaintiff shared custody of her granddaughter with the other grandmother.  They were supposed to switch every week, but the other grandmother took care of the child more due to Plaintiff's migraines.  Plaintiff stated that she watched her granddaughter two to four days a week but returned her to the other grandmother if she had a migraine.  The granddaughter was five years old and in preschool.  She was able to watch TV and entertain herself when Plaintiff had a bad headache.  (Tr. 53-54)

Plaintiff's attorney also questioned Plaintiff, who stated that she was better able to control her mood.  However, at times she became depressed and did not get out of bed.  She experienced these episodes about once a month or every other month.  Plaintiff testified that during these episodes of depression, she would not get out of bed or clean her house.  Other times, she had more energy and was up for days at a time.  During these episodes, Plaintiff went on shopping sprees then had to return the items due to lack of funds.  Her mental issues and migraines caused problems in her relationships.  Plaintiff's caseworker from Community Counseling Center drove her to the hearing, and Plaintiff testified that she received help from the Center since 2006, when she was released from the hospital.  Workers would drive her to the store, motivate her to do things, and check on her well-being at least once a week.  (Tr. 54-57)

Plaintiff reiterated that she experienced severe headaches at least once a week and sometimes twice.  The medication put her to sleep for about 8 hours, but she was okay after that.  Plaintiff would also stay in a dark, quiet room when her headaches were severe.  (Tr. 57-58)

4

A vocational expert ("VE"), Dr. Chrisann Schiro-Geist, also testified at the hearing.  The VE first asked Plaintiff if she supervised other employees while working at Pizza Hut.  The Plaintiff stated that she supervised when they were short-handed.  In addition, Plaintiff stated that the heaviest weight lifted as a welder was between 75 and 100 pounds.  The VE then testified that Plaintiff performed both skilled and unskilled jobs.  Her positions as a cashier and waitress were unskilled, light jobs.  Her job as a shift supervisor was skilled and semi-skilled at the medium level, which was transferrable to below medium.  Finally, as a welder, Plaintiff's work was semi-skilled and heavy, which could transfer to light work.  (Tr. 58-60)

The ALJ then asked the VE to assume a hypothetical individual with Plaintiff's education and work experience and who was also the same age.  The person had no exertional lifting limitations and no limitations on her ability to stand, walk, and sit.  However, she needed to avoid climbing ladders, ropes, and scaffolds; working at unprotected, dangerous heights; and working around unprotected, dangerous machinery.  In addition, she needed to avoid jobs with exposure to whole body vibration.  The individual was limited to performing general, simple and/or repetitive type work that did not require close interaction with the public.  Given this hypothetical, the VE stated that the person would be unable to perform any of Plaintiff's past relevant work. However, the individual could perform jobs at the light level, including food prep, light packing, and light inspection.  If the ALJ reduced the exertional level to sedentary, the number of inspection and packing jobs decreased, and the food prep job would be eliminated.  However, sedentary assembly would be available.  (Tr. 60-62)

The VE further testified that if the person consistently missed more than two days a month, she would be precluded from competitive employment.  Additionally, if the individual

showed up every day but was late, left work early, or took an additional break at least once a

week for a medical reason, she would be unable to work.  (Tr. 62-63)

In a Disability Report – Adult, Plaintiff reported that she could maintain a job with

medication but not without it.  She also stated that she needed help with instructions when

performing a job.  (Tr. 206-16)

In a Function Report – Adult, Plaintiff stated that she was able to make microwave meals

and sandwiches daily.  She could do the cleaning, laundry, household repairs, and mowing with

frequent breaks.  In addition, she was able to shop once a week to daily depending on her moods.

She got along better with others since taking medications.  Plaintiff reported that her conditions

affected her ability to talk, remember, complete tasks, concentrate, understand, follow

instructions, and get along with others.  She was able to follow written and spoken instructions,

and she "somewhat" got along with authority figures.  Plaintiff could handle changes in a routine

and could handle stress until her mood bottomed out.  (Tr. 259-64)

### III.  Medical Evidence

On December 18, 2006, Plaintiff was admitted to Southeast Missouri Hospital after

complaining of suicidal thoughts and depression.  Treatment notes indicated a history of Bipolar

Disorder, Borderline Personality Disorder, and multiple hospitalizations in the past. Plaintiff was

discharged on December 21, 2006 with diagnoses of Bipolar Disorder, depressed; Borderline

Personality Disorder; Headache; and a global assessment of functioning (GAF) of 40 on admission

and 55 on discharge.  (Tr. 476-80)

Dr. David Y.S. Lee examined Plaintiff on June 9, 2008, for chronic daily headaches.  Dr.

Lee noted that Plaintiff was not in distress.  The examination was remarkable for the absence of

papilledema or meningismus, normal orientation, mild facial asymmetry, symmetrical deep tendon reflexes, and flexor plantar responses.  Dr. Lee assessed chronic daily headaches and noted that they could be secondary to a combination of transformed migraine and tension-type headaches. Dr. Lee recommended a CT head scan if Medicaid approved; increased dosage of Topamax; eventual trial of Depakote ER; and IV DHE-45 therapy if indicated.  (Tr. 311-12)

On August 20, 2008, Dr. Paul Rexroat performed a psychological evaluation at the request of Disability Determination Services.  Plaintiff reported that she could not hold a job because of mood swings and migraines.  She also reported depression, manic periods with lack of sleep and high energy, racing thoughts, feelings of irritability, and trouble finishing projects. Plaintiff's memory, calculation, and concentration were good.  Dr. Rexroat estimated her IQ to be low average.  She could understand and remember simple instructions and sustain concentration and persistence with simple tasks.  Plaintiff had mild limitations in her abilities ot interact socially and adapt to her environment.  Dr. Rexroat noted that Plaintiff did housework, listened to the radio, and watched TV.  She had good social skills, however she could not manage her own funds due to spending binges.  Dr. Rexroat diagnosed bipolar disorder, mixed, severe, only moderately well-controlled with medications, and he and assessed a GAF score of 51.  (Tr. 301-04)  On September 29, 2008, Dr. Rexroat completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) and opined that Plaintiff had moderate limitations in her ability to maintain work-related social functioning.  (Tr. 314-15)

Plaintiff returned to Dr. Lee on October 17, 2008, who noted that Plaintiff saw little improvement to her daily headaches despite an increase in medication dosage.  Dr. Lee planned to order a CT head scan and hospitalize her if her condition did not improve.  (Tr. 308)  On

November 12, 2008, Dr. Lee admitted Plaintiff to the hospital for IV DHE-45 therapy.  He noted

that the recent CT head scan was unremarkable.  On admission, Plaintiff rated her headache at

10/10, but the pain went down to 3/10 after completing six doses of the IV medication.  Dr. Lee

diagnosed intractable chronic daily headaches; history of bipolar and personality disorder; history

of postpartum depression; and mild anemia.  She was discharged on November 15, 2008.  (Tr.

309-10, 482-84)  On December 1, 2008, Plaintiff diagnosed with thrombosis after receiving IV

treatment for her headaches. (Tr. 330)

Plaintiff received psychological treatment at Community Counseling Center on November

24, 2008.  She was tearful and reported worsening depression related to several stressors at

home.  Plaintiff was given Effexor.  (Tr. 361)  In December of 2008, saw Dr. Shazitera Nawaz at

the Community Counseling Center for mental health treatment and to receive prescription

medication.  On December 24, 2008, Plaintiff reported doing better.  Her son was in jail on drug

charges, and she was worried about her daughter.  (Tr. 356-60)

During an annual assessment through the Community Counseling Center on February 12,

2009, Jamie Buchek, Med, NCC, LPC noted that Plaintiff was a fairly reliable historian.  Plaintiff

was able to care for her personal needs, as well as shopping, cooking, and household needs.  She

enjoyed shooting pool, karaoke, and spending time with friends playing games.  Plaintiff was

treated by Dr. Nawaz and had several prior hospitalizations.  She reported being depressed at

times and having a lot of energy at other times.  She stated that she was irritable and anxious most

days.  Family issues increased her depression and irritability.  Ms. Buchek noted a diagnosis form

Dr. Nawaz consisting of bipolar II disorder; borderline personality disorder; migraines; and family,

social, educational, economic and occupational problems.  Ms. Buchek recommended that

Plaintiff would continue treatment, noting that on that date, Plaintiff was pleasant and cooperative, with adequate recall.  Plaintiff requested help getting rid of her headache and in getting social security to improve her finances.  (Tr. 363-68)

On February 16, 2009, Plaintiff presented to Barnes Jewish Hospital for a consultation regarding her headaches.  Neurologic exam was normal.  Dr. Becky Parks noted that it was unclear how much of her daily headache could be due to medication overuse.  Plaintiff said she could not use Topamax during the day even though it made her headaches better.  Dr. Parks' plan included considering increasing propranolol and watching for signs of low blood pressure; recommending use of Imitrex for migraines; and stopping use of Darvocet; considering nortriptyline or higher doses of Topamax, after coordinating with Plaintiff's psychiatrist; and following up with Dr. Lee.  (Tr. 319-22)

On February 22, 2009, Plaintiff presented to the emergency room at Saint Genevieve County Memorial Hospital for complaints fo a headache.  Plaintiff stated that she usually received a shot, which worked.  After IV medication, Plaintiff's headache subsided, and she was sent home.  (Tr. 325-28)

Plaintiff continued to receive treatment including medication adjustments from Dr. Nawaz and Dr. Lee into April of 2009.  (Tr. 306, 353-54)  In August of 2009, Plaintiff presented to the Perryville Family Care for complaints of elbow and wrist pain; a skin lesion; memory loss; migraine headaches; and thrush.  (Tr. 405-12)  Plaintiff returned to Perryville Family Care in November of 2009, complaining of upper back and shoulder pain.  (Tr. 399-404).  In addition, Plaintiff was seen in the emergency room at Perry County Hospital on four occasions due to her headaches from July through December of 2009.  (Tr. 427-438)

9

On July 27, 2009, James Spence, Ph.D., completed a Psychiatric Review Technique form. Dr. Spence noted that Plaintiff had moderate limitations in restrictions of daily living; difficulties in maintaining social functioning; and difficulties in maintaining concentration, persistence, or pace.  Dr. Spence stated that Plaintiff's statements were partially credible in that the clinical findings did not fully support her allegations.  Dr. Spence opined that Plaintiff retained the capability to perform simple, repetitive tasks on a regular basis away from the general public.  (Tr. 338-48)

On March 16, 2010, Plaintiff underwent an annual psychiatric assessment at the Community Counseling Center.  Danetta Pierson, M.S.W. noted that Plaintiff had been arrested in the past year for a DWI and disorderly conduct.  She received unsupervised probation.  Plaintiff was cooperative and respectful during the interview process.  Plaintiff became tearful during the evaluation.  Her memory was intact and intellectual ability average.  Ms. Pierson noted Dr. Nawaz's diagnoses of  bipolar-II disorder; borderline personality disorder, severe; migraines; family, social, and economic problems; and a GAF of 60.  Ms. Pierson recommended that Plaintiff continue treatment, noting that Plaintiff's treatment goals were to take care of herself and pay her bills.  (Tr. 464-68)

Plaintiff underwent an MRI of her brain on March 19, 2010, to evaluate her headaches. The MRI revealed a right pontine enhancing lesion consistent with brain capillary telangiectasia, which could have something to do with the headaches.  (Tr. 371-373)

On June 1, 2010, Plaintiff told Dr. Nawaz that she was emotional and hypomanic. Plaintiff displayed poor eye contact.  Her mood was okay, and her affect was restricted.  Dr. Nawaz assessed bipolar disorder and borderline personality disorder and adjusted Plaintiff's

medications.  (Tr. 459)  In a follow-up visit at the Community Counseling Center on June 22, 2010, Plaintiff's medications were adjusted after she reported side effects from her medication regimen.  (Tr. 457)

On August 13, September 17, and October 16, 2010, Plaintiff presented to the emergency room at Perry County Hospital for complaints of headaches.  (Tr. 415-424)  Plaintiff received injections for her headaches at Saint Genevieve County Memorial Hospital emergency room on December 7, 2010. (Tr. 492-500)

On January 18, 2011, Plaintiff attended an appointment at the Community Counseling Center.  She reported doing fairly okay with no major issues.  Her sleep was good, and her headaches were better with medication.  Mental status exam revealed poor eye contact, "not good" mood, and restricted affect.  Dr. Nawaz recommended that Plaintiff continue medications. (Tr. 449)

On January 17, 2011, Dr. David Kapp completed a Migraine Questionnaire, noting that Plaintiff experienced frequent migraine headaches which were improved with medication.  Dr. Kapp was uncertain whether Plaintiff could function in a work setting when the migraines occurred due to many visits to the ER.  Dr. Kapp further noted that Plaintiff was compliant with treatment.  (Tr. 444)

On January 18, 2011, Dr. Nawaz completed a Medical Source Statement – Mental regarding what Plaintiff could do despite her impairments.  Dr. Nawaz opined that Plaintiff was moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance; and be punctual with customary tolerances; work

11

in coordination with or proximity to others without being distracted by them; complete a normal

workday and workweek without interruption from psychologically based symptoms and perform

at a consistent pace without an unreasonable number and length of rest periods; accept

instructions and respond appropriately to criticism from supervisors; get along with coworkers or

peers without distracting them or exhibiting behavioral extremes; respond appropriately to

changes in the work setting; travel in unfamiliar places or use public transportation; and set

realistic goals or make plans independently of others.  (Tr. 446-47)  Finally, on January 19, 2011,

Dr. David Lee completed a Migraine Questionnaire, stating that Plaintiff had daily headaches

when he saw her in March 2009.  The headaches were not controlled at that time.  He further

stated that Plaintiff had trouble functioning in a work setting, but he had not seen her since March

2009.  Plaintiff was compliant with treatment.  (Tr. 475)

## IV.  The ALJ's Determination

In a decision dated June 24, 2011, the ALJ found that Plaintiff met the insured status

requirements of the Social Security Act through March 31, 2009 and had not engaged in

substantial gainful employment since the alleged onset date of October 16, 2008.  Plaintiff had the

severe impairments of bipolar disorder, borderline personality disorder, and migraine headaches.

However, Plaintiff did not have an impairment or combination of impairments that met or

medically equaled one of the listed impairments.  (Tr. 13-17)

The ALJ determined that, after carefully considering the entire record, Plaintiff had the

residual functional capacity ("RFC") to perform a full range of work at all exertional levels except

for climbing ladders, ropes, or scaffolds; exposure to unprotected heights, dangerous machinery,

or whole body vibration; and performing more than simple or repetitive work not requiring close

interaction with the public.  The ALJ found that Plaintiff was unable to perform any past relevant

work.  However, based on her younger age, limited education, work experience, and RFC, the

ALJ determined that jobs existed in significant numbers in the national economy which the

Plaintiff could perform.  These jobs included food preparation worker, packer, or inspector.

Thus, the ALJ concluded that the Plaintiff had not been under a disability, as defined in the Social

Security Act, from October 16, 2008 through the date of the decision.  (Tr. 17-21)

## V.  Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers

from a physical or mental disability.  42 U.S.C. § 423(a)(1).  The Social Security Act defines

disability as "the inability to do any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period not less than 12 months."  20 C.F.R. §

404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step

evaluation process.  See 20 C.F.R. § 404.1520(b)-(f).  Those steps require a claimant to show: (1)

that claimant is not engaged in substantial gainful activity; (2) that she has a severe impairment or

combination of impairments which significantly limits her physical or mental ability to do basic

work activities; or (3) she has an impairment which meets or exceeds one of the impairments

listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work;

and (5) her impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence.

42 U.S.C. § 405(g).  "Substantial evidence 'is less than a preponderance, but enough so that a

13

reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)).  The Court does not re-weigh the evidence or review the record de novo.  Id. at 1328 (citing Robert v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)).  Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence.  Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995).  It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence.  Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[4] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion.  Marciniak, 49 F.3d at 1354.

## IV.  Discussion

In her Brief in Support of the Complaint, Plaintiff asserts that substantial evidence does not support the ALJ's RFC determination because the ALJ failed to properly assess the opinions of Plaintiff's treating physicians; the ALJ failed to base Plaintiff's RFC on substantial medical and non-medical evidence in the record and failed to include sufficient limitations connected to all her impairments; and the ALJ erred in discrediting Plaintiff's testimony and allegations. Defendant, on the other hand, contends that the ALJ assigned proper weight to the medical opinions in the record; properly assessed Plaintiff's credibility; and properly formulated her RFC.  The undersigned agrees that the ALJ failed to discuss the weight assigned to the opinions of Plaintiff's treating physicians and finds that the case should be remanded for proper evaluation.

Plaintiff specifically argues that the ALJ failed to properly analyze the opinions of Plaintiff's treating physicians, Dr. Lee, Dr. Kapp, and Dr. Nawaz.  Defendant contends that the

---

[4]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

ALJ assigned the proper weight to these treating doctors and to the non-examining psychologist,

Dr. Spence.

"In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision

the weight given to any opinions from treating sources, non-treating sources and non-examining

sources."  Lewis v. Astrue, 4:10CV1131 FRB, 2011 WL 4407728, at *24 (E.D. Mo. Sept. 22,

2011) (citing 20 C.F.R. § 404.1527).  "A treating physician's opinion should not ordinarily be

disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in the record."  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000)

(citations omitted); see also SSR 96-2p, 1996 WL 374188 (July 2, 1996) ("Controlling weight

may not be given to a treating source's medical opinion unless the opinion is well-supported by

medically acceptable clinical and laboratory diagnostic techniques.").   The ALJ need not give

controlling weight to a treating physician's opinion where the physician's treatment notes were

inconsistent with the physician's RFC assessment.  Goetz v. Barnhart, 182 F. App'x 625, 626 (8th

Cir. 2006).   Further, "[i]t is appropriate to give little weight to statements of opinion by a treating

physician that consist of nothing more than vague, conclusory statements."  Swarnes v. Astrue,

Civ. No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted).

While the record demonstrates that the ALJ did discuss the medical records and opinions

of Drs. Lee, Kapp, and Nawaz, Plaintiff correctly points out that nowhere in the decision does the

ALJ assign a specific weight to these opinions.   The Regulations provide, however, that the

Commissioner evaluates every medical opinion and considers the following factors in deciding the

amount of weight to give the opinions: (1) the examining relationship; (2) the treatment

16

relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors which tend to support or contradict the opinion.  20 C.F.R.§ 404.1527(c).  In addition, the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given] your treating source's opinion."  20 C.F.R.  § 404.1527(c)(2).

Plaintiff contends, and the Defendant does not dispute, that the ALJ failed to assign a specific weight to the opinions of Dr. Kapp, Plaintiff's treating physician, and Dr. Lee, Plaintiff's treating neurologist.  Defendant maintains, however, that this failure was harmless error.  Review of the ALJ's determination demonstrates that the ALJ did not assign any weight to the doctors, let alone give controlling weight.  Dr. Kapp noted that he was uncertain about Plaintiff's ability to function in the workplace due to multiple visits to the emergency room.  He also noted treatment by another neurologist, whose treatment notes are absent from the record.  (Tr. 444)  Dr. Lee, who consistently treated Plaintiff in 2008 and the beginning of 2009, opined that, during a period of alleged disability, Plaintiff had trouble functioning in a work setting.  (Tr. 475)  "When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so." Boyster v. Astrue, 4:11-CV-02249 CEJ, 2013 WL 147623, at *8 (E.D. Mo. Jan. 14, 2013) (quoting Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir.2007)).

Although good reasons for discrediting these opinions may exist, the decision of the ALJ fails to give any such reasons, nor can this court imply any reasons in light of the ALJ's vague discussion of these opinions and sparse explanation of the his conclusions pertaining to Plaintiff's headaches.  As a result, the case should be remanded for the ALJ to thoroughly explain his reasoning for the weight given to the opinions of the physicians who treated Plaintiff for migraine headaches.  See Angel v. Colvin, No. 2:11CV0092 TCM, 2013 WL 1197013, at *11 (E.D. Mo.

Mar. 25, 2013) (remanding to the ALJ for further explanation where ALJ failed to give reasons for rejecting the opinions of the plaintiff's treating physicians).  On remand, the ALJ may also wish to contact the neurologist now treating Plaintiff's headaches.

Further, while the ALJ mentions Dr. Nawaz's opinion as supporting the non-examining consulting psychologist's opinion, the ALJ fails to indicate the amount of weight given to Dr. Nawaz and merely gives cursory reference to the Medical Source Statement.  (Tr. 19)   The undersigned also questions the ALJ's reliance on the non-examining consultant, Dr. Spence.  The opinion of a non-examining consulting physician does not generally constitute substantial evidence.  Jenkins v. Apfel, 196, F.3d 922, 925 (8th Cir. 1999) (citation omitted).  According to the regulations, "[b]ecause nonexamining sources have no examining or treating relationship with [claimant], the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions."  20 C.F.R. § 404.1527(c)(3).  Further, "when evaluating a nonexamining source's opinion, the ALJ 'evaluate[s] the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources.'"  Wildman v. Astrue, 596 F.3d 959, 967 (8th Cir. 2010) (quoting 20 C.F.R. § 404.1527(c)(3)).  The ALJ must explain the weight given to the opinions of nonexamining psychologists.  SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996).

The ALJ fails to indicate the amount of weight give to Dr. Spence, and instead merely states that he "generally accepts the opinion" as supported by and consistent with the objective medical evidence.  (Tr. 19)  "Without any explanation as to the weight given to the opinion, the undersigned cannot find that the ALJ properly weighed and considered [Dr. Spence's] opinion."  George v. Astrue, No. 4:10-CV-02136-RWS-NAB, 2012 WL 1032973, at *13 (E.D. Mo. March

6, 2012).  Based on the foregoing, the Court finds that the case should be remanded to the ALJ to properly evaluate and weigh the opinions of the treating physicians and the state agency consultant, as well as provide a thorough explanation of and reason for the weight given to those opinions.

IT IS HEREBY ORDERED that the final decision of the Commissioner denying social security benefits be REVERSED and REMANDED to the Commissioner for further proceedings consistent with this Memorandum and Order.  A separate Judgment in accordance with this Memorandum and Order is entered this same date.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this 17th day of September, 2013.

19